# IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

TAWAN CHILDS ) CASE NO.
1230 Gabriel Elaine Drive, Apt. 207 )
Columbus, Ohio 43228 ) JUDGE:
)
        Plaintiff, )
)
     v. ) **COMPLAINT FOR DAMAGES**
) **AND INJUNCTIVE RELIEF**
THE KROGER CO. )
c/o Corporation Service Company ) **JURY DEMAND ENDORSED**
50 West Broad Street, Suite 1330 ) **HEREIN**
Columbus, Ohio 43215 )
)
  -and- )
)
HEATHER GRAY )
4111 Executive Parkway )
Westerville, Ohio 43081 )
)
  -and- )
)
PATTI HUTCHINSON )
4111 Executive Parkway )
Westerville, Ohio 43081 )
)
  -and- )
)
LEVI VANREETH )
4111 Executive Parkway )
Westerville, Ohio 43081, )
)
        Defendants. )

Plaintiff, Tawan Childs, by and through undersigned counsel, as his Complaint against the Defendants, states and avers the following:

### PARTIES AND VENUE

1. Childs is a resident of the city of Columbus, Franklin County, Ohio.

2. At all times herein, Childs was acting in the course and scope of his employment.

3. The Kroger Co. ("Kroger") is a domestic corporation with its principal place of business located in the city of Cincinnati, Hamilton County, Ohio.

4. Kroger is and, at all times hereinafter mentioned, was an employer within the meaning of R.C. § 4112.01 *et seq.*

5. Heather Gray is a resident of the state of Kansas.

6. At all times herein, Gray was acting in the course and scope of her employment.

7. Gray is and, at all times hereinafter mentioned, was an individual who was a manager and/or supervisor at Kroger and who acted directly or indirectly in the interest of the Kroger in relation to its employees, and is an employer within the meaning of R.C. § 4112.01 *et seq.*

8. Patti Hutchinson is a resident of the state of Ohio.

9. At all times herein, Hutchinson was acting in the course and scope of her employment.

10. Hutchinson is and, at all times hereinafter mentioned, was an individual who was a manager and/or supervisor at Kroger and who acted directly or indirectly in the interest of the Kroger in relation to its employees, and is an employer within the meaning of R.C. § 4112.01 *et seq.*

11. Levi VanReeth is a resident of the state of Ohio.

12. At all times herein, VanReeth was acting in the course and scope of his employment.

13. VanReeth is and, at all times hereinafter mentioned, was an individual who was a manager and/or supervisor at Kroger and who acted directly or indirectly in the interest of the Kroger in relation to its employees, and is an employer within the meaning of R.C. § 4112.01 *et seq.*

14. The events described herein took place in Franklin County, Ohio.

15. Therefore, personal jurisdiction is proper over Defendants pursuant to R.C. § 2307.382(A)(1) and (4).

16. Venue is proper pursuant to Civ. R. 3(C)(3).

17. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## **FACTS**

18. Childs is a former employee of Kroger.

19. In or about November 2014, Childs was hired by Kroger.

20. At all relevant times, Childs was qualified for the jobs he held at Kroger.

21. In or about 1996, Childs was sent to prison for a conviction on charges he committed as a minor ("Conviction").

22. After Childs was released from prison, he was a law-abiding citizen.

23. When Childs applied for his first job at Kroger, Childs disclosed his Conviction.

24. In or about November 2014, Kroger knew about the Conviction.

25. Kroger decided to hire Childs because Childs was qualified for the job to which he applied.

26. VanReeth did not participate in the decision to hire Childs.

27. Hutchinson did not participate in the decision to hire Childs.

28. In or about 2016, Childs applied for a promotion to Assistant Store Manager ("2016 Application").

29. In the 2016 Application, Childs disclosed his Conviction.

30. In or about May 2016, Kroger promoted Childs to Assistant Store Manager.

31. Kroger decided to promote Childs, knowing about the Conviction, because Childs was a good employee.

32. Kroger decided to promote Childs, knowing about the Conviction, because Childs was qualified for the job to which he applied.

33. In or about 2017, Childs was diagnosed with depression, anxiety, and post-traumatic stress disorder (collectively, "Childs's Medical Conditions").

34. As a result of Childs's Medical Conditions, Childs is and was disabled within the meaning of R.C. § 4112.01(A)(13).

35. As a result of Childs's Medical Conditions, Defendants perceived Childs as being disabled.

3

36. As a result of Childs's Medical Conditions, the Defendants perceived that Childs's medical condition constituted a mental impairment.

37. As a result of Childs's Medical Conditions, Defendants perceived Childs's disability to impair substantially one or more of his major life activities, including working.

38. Despite this actual or perceived disabling condition, Childs was still able to perform the essential functions of his job.

39. In or about 2017, Childs worked at a Kroger store in Reynoldsburg, Ohio ("Reynoldsburg Store").

40. The Reynoldsburg Store is located in Franklin County, Ohio.

41. During the relevant period, VanReeth was Store Manager at the Reynoldsburg Store.

42. On or about February 28, 2017, Childs was robbed at knifepoint while he was at work ("Robbery").

43. The Robbery occurred at the Reynoldsburg Store.

44. Childs's Medical Conditions grew worse after the Robbery.

45. After the Robbery, Childs began to have panic attacks at work.

46. After the Robbery, Childs's Medical Conditions made it difficult for him to perform his job duties without accommodation.

47. In or about March 2017, Childs discussed his Medical Conditions with VanReeth.

48. In or about March 2017, Childs explained to VanReeth that he needed a disability accommodation ("First Accommodation Request").

49. The First Accommodation Request was a request for a disability accommodation within the meaning of R.C. § 4112.01 *et seq.*

50. In or about March 2017, Childs explained to VanReeth that he was concerned for his safety in the store.

51. VanReeth did not offer Childs a disability accommodation.

52. VanReeth did not engage in the interactive process to determine what accommodation would be reasonable for Childs's Medical Conditions.

53. VanReeth did not report Childs's First Accommodation Request to anyone higher up in Kroger's management.

54. Kroger did not provide a disability accommodation.

55. In or about July 2017, Childs's doctor recommended that Childs request to be transferred to a different store.

56. Childs's doctor told Childs that moving to a different store was likely to improve the symptoms of Childs's Medical Conditions.

57. On or about July 3, 2017, Childs spoke to Human Resources ("HR") Representative Hutchinson ("Second Accommodation Request").

58. The Second Accommodation Request was a request for a disability accommodation within the meaning of R.C. § 4112.01 *et seq.*

59. In the Second Accommodation Request, Childs asked Hutchinson to transfer him to a different store.

60. In the Second Accommodation Request, Childs provided a note from his doctor, explaining that moving to a different store was likely to improve the symptoms of Childs's Medical Conditions.

61. Hutchinson scoffed at the Second Accommodation Request.

62. Hutchinson refused to move Childs to a different location.

63. Hutchinson refused to offer an alternative accommodation.

Case 2:20-cv-04216-EAS-EPD Doc # 2 Filed 08/19/20 Page 6 of 21 PAGEID #: 122

64. Hutchinson refused to accommodate Childs's disabilities.

65. Hutchinson did not engage in the interactive process to determine what accommodation would be reasonable for Childs's Medical Conditions.

66. Kroger has a policy of making reasonable accommodations for employees' disabilities ("Accommodation Policy").

67. In the alternative, Kroger has no Accommodation Policy.

68. Kroger's Accommodation Policy requires Store Managers to make a good-faith effort to provide a reasonable accommodation when they learn of an employee's disability.

69. In the alternative, Kroger's Accommodation Policy does not require Store Managers to make a good-faith effort to provide a reasonable accommodation when they learn of an employee's disability.

70. Kroger's Accommodation Policy requires HR representatives to make a good-faith effort to provide a reasonable accommodation when they learn of an employee's disability.

71. In the alternative, Kroger's Accommodation Policy does not require HR representatives to make a good-faith effort to provide a reasonable accommodation when they learn of an employee's disability.

72. VanReeth did not make a good-faith attempt to accommodate Childs's disability.

73. Hutchinson did not make a good-faith attempt to accommodate Childs's disability.

74. VanReeth violated Kroger's Accommodation Policy when he refused Childs's First Accommodation Request.

75. Hutchinson violated Kroger's Accommodation Policy when she refused Childs's Second Accommodation Request.

76. VanReeth was not given a verbal warning for refusing Childs's First Accommodation Request.

77. VanReeth was not given a written warning for refusing Childs's First Accommodation Request.

78. VanReeth was not suspended for refusing Childs's First Accommodation Request.

79. VanReeth was not terminated for refusing Childs's First Accommodation Request.

80. VanReeth was not disciplined at all for refusing Childs's First Accommodation Request.

81. Hutchinson was not given a verbal warning for refusing Childs's Second Accommodation Request.

82. Hutchinson was not given a written warning for refusing Childs's Second Accommodation Request.

83. Hutchinson was not suspended for refusing Childs's Second Accommodation Request.

84. Hutchinson was not terminated for refusing Childs's Second Accommodation Request.

85. Hutchinson was not disciplined at all for refusing Childs's Second Accommodation Request.

86. Childs is African American.

87. Upon information and belief, VanReeth is Caucasian.

88. Childs is a member of a protected class on the basis of his race.

89. Upon information and belief, VanReeth is not a member of the same race as Childs.

90. Upon information and belief, Hutchinson is not a member of the same race as Childs.

91. During the relevant period, Childs was one of very few African American members of management at the stores where he worked.

92. Childs's superiors treated him unfavorably compared to his similarly-situated Caucasian counterparts.

93. While Childs worked at the Reynoldsburg Store, VanReeth was Childs's direct supervisor.

94. While Childs worked at the Reynoldsburg Store, VanReeth monitored Childs's performance closely.

95. While Childs worked at the Reynoldsburg Store, VanReeth monitored Childs's performance more closely than the performance of Childs's similarly-situated Caucasian counterparts.

96. In or about June 2017, Childs complained to VanReeth that VanReeth was treating him unfavorably because of his race ("First Report of Discrimination").

97. In or about July 2017, VanReeth put Childs on a Performance Improvement Plan ("Discriminatory PIP").

98. The Discriminatory PIP was an adverse employment action.

99. The Discriminatory PIP was an adverse action.

100. VanReeth put Childs on a PIP because of his race.

101. VanReeth put Childs on a PIP in retaliation for the First Report of Discrimination.

102. In or about July 2017, Childs complained to Kroger's HR Department that VanReeth was discriminating against him on the basis of race ("Second Report of Discrimination").

103. In the Second Report of Discrimination, Childs expressed his belief that VanReeth had put him on a PIP because of his race.

104. In the Second Report of Discrimination, Childs expressed his belief that VanReeth had put him on a PIP in retaliation for his First Report of Discrimination.

105. Kroger has a policy against race discrimination ("Discrimination Policy").

106. Kroger's Discrimination Policy precludes retaliation against employees who complain about race discrimination.

107. Alternatively, retaliation against employees who complain about race discrimination is permitted by Kroger.

8

108. Kroger's Discrimination Policy precludes intimidation against employees who complain about race discrimination.

109. Alternatively, intimidation against employees who complain about race discrimination is permitted by Kroger.

110. Kroger's Discrimination Policy requires employees to report what they reasonably believe is a violation of the Discrimination Policy.

111. Kroger's Discrimination Policy precludes retaliation against employees who report a violation of the Discrimination Policy.

112. Alternatively, retaliation against employees who report a violation of the Discrimination Policy is permitted by Kroger.

113. Kroger's Discrimination Policy precludes intimidation against employees who report a violation of the Discrimination Policy.

114. Alternatively, intimidation against employees who report a violation of the Discrimination Policy is permitted by Kroger.

115. Issuing a PIP because of an employee's race violates the Discrimination Policy.

116. Issuing a PIP in retaliation for reporting discrimination violates the Discrimination Policy.

117. Kroger has a policy to investigate reports of violations of its Discrimination Policy.

118. An investigation should include interviewing the complainant.

119. An investigation should include interviewing the subject of the complaint.

120. An investigation should include interviewing the subject of the reported discrimination.

121. An investigation should include interviewing witnesses to the reported discrimination.

122. An investigation should include getting a written statement from the complainant.

123. An investigation should include getting a written statement from the subject of the complaint.

124. An investigation should include getting a written statement from the subject of the reported discrimination.

125. In response to Childs's report of the Discriminatory PIP, Defendants did not interview Childs.

126. In response to Childs's report of the Discriminatory PIP, Defendants did not interview VanReeth.

127. In response to Childs's report of the Discriminatory PIP, Defendants did not interview witnesses.

128. In response to Childs's report of the Discriminatory PIP, Defendants did not get a written statement from Childs.

129. In response to Childs's report of the Discriminatory PIP, Defendants did not get a written statement from VanReeth.

130. In response to Childs's report of the Discriminatory PIP, Defendants did not get a written statement from witnesses.

131. Defendants did not investigate Childs's report of the Discriminatory PIP.

132. Defendants violated their own policies with regard to the Discriminatory PIP.

133. In or about July 2017, Defendants removed the Discriminatory PIP from Childs's record.

134. In or about July 2017, Defendants recognized that the Discriminatory PIP was racially discriminatory.

135. In or about July 2017, Defendants recognized that the Discriminatory PIP was retaliation for Childs's First Report of Discrimination.

136. Defendants did not give VanReeth a verbal warning for race discrimination.

137. Defendants did not give VanReeth a verbal warning for retaliation.

138. Defendants did not give VanReeth a written warning for race discrimination.

139. Defendants did not give VanReeth a written warning for retaliation.

140. Defendants did not give VanReeth a suspension for race discrimination.

141. Defendants did not give VanReeth a suspension for retaliation.

142. Defendants did not give VanReeth a termination for race discrimination.

143. Defendants did not give VanReeth a termination for retaliation.

144. Defendants did not discipline VanReeth at all for race discrimination.

145. Defendants did not discipline VanReeth at all for retaliation.

146. In the Second Report of Discrimination, Childs requested to be moved out of the Reynoldsburg Store.

147. After the Second Report of Discrimination, Kroger required Childs to continue to work at the Reynoldsburg Store.

148. After the Second Report of Discrimination, Kroger required Childs to continue to work under the supervision of VanReeth.

149. After the Second Report of Discrimination, VanReeth gossiped with other Kroger employees about Childs's Conviction ("Retaliatory Gossip").

150. The Retaliatory Gossip was retaliation for Childs's Reports of Discrimination.

151. In or about December 2017, Childs moved to the Kroger store located at 131 State Route 3, Sunbury, Ohio 43074 ("Sunbury Store")

152. In or about January 2018, Childs applied for a promotion ("2018 Application").

153. In the 2018 Application, Childs disclosed the Conviction.

154. In or about January 2018, one of the employees at the Sunbury Store was convicted of a sexually abusing a 13-year-old ("Sex Offender").

155. In or about April 2018, Childs learned that the Sex Offender had been convicted of sexually abusing a 13-year-old.

156. In or about April 2018, multiple minors worked at the Sunbury Store.

157. In or about April 2018, Childs was a member of the management team at the Sunbury Store.

158. Kroger has a policy requiring members of the management team to report to HR and/or higher-level managers if they believe there is a potential danger to employees ("Safety Policy").

159. In the alternative, Kroger has no policy requiring members of the management team to report if they believe there is a potential danger to employees.

160. Childs reasonably believed that having the Sex Offender work in close proximity to minors could endanger the minors.

161. In or about April 2018, Childs reported to Hutchison, Leighanne Heitkamp, and John Younkin that the Sex Offender posed a potential danger to minors ("Safety Report").

162. At the relevant time, Hutchison was a representative of Kroger's HR department.

163. At the relevant time, Heitkamp was the Store Manager at the Sunbury Store.

164. At the relevant time, Younkin was District Head of Loss and Prevention.

165. Childs made the Safety Report in compliance with the Safety Policy.

166. After Childs made the Safety Report, Kroger terminated the Sex Offender.

167. In or about April 2018, Childs attended a diversity meeting held by Kroger ("Diversity Meeting").

168. At the Diversity Meeting, Childs learned about Kroger's lack of diversity among management.

169. Childs was troubled by the statistics about management's lack of diversity he learned at the Diversity Meeting.

170. In or about April 2018, when Childs returned from the Diversity Meeting, Childs explained to his colleagues at the Sunbury Store about Kroger's lack of diversity in management ("Final Race Discrimination Complaint").

171. On or about May 29, 2018, Gray and Steve Shepard met with Childs ("Termination Meeting").

172. At the relevant time, Gray was a representative of Kroger's HR department.

173. Upon information and belief, Gray is Caucasian.

174. At the relevant time, Shepard was Kroger's Organized Retail Crime Manager.

175. Upon information and belief, Shepard is Caucasian.

176. At the Termination Meeting, Gray and Shepard notified Childs that Kroger was terminating Childs's employment.

177. Defendants' termination of Childs was an adverse employment action.

178. Defendants' termination of Childs was an adverse action.

179. At the Termination Meeting, Gray alleged that the reason for Childs's termination was that he had failed to disclose the Conviction on a job application ("Termination Excuse").

180. At the Termination Meeting, Shepard alleged that the reason for Childs's termination was that he had failed to disclose the Conviction on a job application ("Termination Excuse").

181. In or about November 2014, Childs disclosed the Conviction when he applied for his first job at Kroger.

182. In the 2016 Application, Childs disclosed the Conviction.

183. In the 2018 Application, Childs disclosed the Conviction.

184. Childs disclosed the Conviction every time he applied for a job with Kroger.

185. The Termination Excuse was pretextual.

13

Case 2:20-cv-04216-EAS-EPD Doc #: 2 Filed: 08/18/20 Page: 14 of 21 PAGEID #: 130

186. The Termination Excuse had no basis in fact.

187. The Termination Excuse was not the real reason for terminating Childs's employment.

188. The Termination Excuse was an insufficient reason to terminate Childs's employment.

189. At the Termination Meeting, Gray called Childs a "thug."

190. At the Termination Meeting, Gray said, "Black thug or black professional – which is it?"

191. "Thug" is a racial slur against African Americans.

192. Gray was not given a verbal warning as a result of her discriminatory remarks to Childs.

193. Gray was not given a written warning as a result of her discriminatory remarks to Childs.

194. Gray's employment at Kroger was not suspended as a result of her discriminatory remarks to Childs.

195. Gray's employment at Kroger was not terminated as a result of her discriminatory remarks to Childs.

196. Gray was not disciplined at all as a result of her discriminatory remarks to Childs.

197. Defendants terminated Childs's employment because of his race.

198. Defendants terminated Childs's employment because of his disability.

199. Defendants terminated Childs's employment because of his perceived disability.

200. Defendants terminated Childs's employment in retaliation for his Race Discrimination Complaints.

201. Defendants terminated Childs's employment in retaliation for his Safety Report.

202. After Childs's termination, Gray told Childs's former supervisors and colleagues that Childs had lied about the Conviction on a job application ("Termination Excuse").

203. The Termination Excuse was false.

204. Gray was a member of the committee that reviewed Childs's 2016 Application.

205. Gray was a member of the committee that reviewed Childs's 2018 Application.

206. Gray knew or should have known that Childs disclosed the Conviction on the 2016 Application.

207. Gray knew or should have known that Childs disclosed the Conviction on the 2018 Application.

208. Gray knew or should have known that the Termination Excuse was false.

209. Gray was reckless as to whether the Termination Excuse was false.

210. Gray's publication of the Termination Excuse hurt Childs's reputation.

211. Gray's publication of the Termination Excuse has made it more difficult for Childs to find further employment after his termination from Kroger.

212. As a direct and proximate result of Defendant's conduct, Childs suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## <u>COUNT I: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq.*</u>

### (All Defendants)

213. Childs restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

214. Defendants treated Childs differently than other similarly-situated employees based on his disabling condition.

215. Defendants treated Childs differently than other similarly-situated employees based on his perceived disabling condition.

216. Childs informed Defendants of his disabling condition.

217. Childs requested accommodations from Defendants to assist with his disabilities including moving to a different location.

15

218. Childs's requested accommodations were reasonable.

219. There was an accommodation available that would have been effective and would have not posed an undue hardship to Kroger.

220. Defendants failed to engage in the interactive process of determining whether Childs needed an accommodation.

221. Defendants failed to provide an accommodation.

222. Defendants violated R.C. § 4112.02 by failing to provide Childs a reasonable accommodation.

223. On or about May 29, 2018, Defendant terminated Childs's employment without just cause.

224. Defendants terminated Childs's employment based his disability.

225. Defendants terminated Childs's employment based his perceived disability.

226. Defendants violated R.C. § 4112.02 when they discharged Childs based on his disability.

227. Defendants violated R.C. § 4112.02 when they discharged Childs based on his perceived disability.

228. Defendants violated R.C. § 4112.02 by discriminating against Childs based on his disabling condition.

229. Kroger violated R.C. § 4112.02 by discriminating against Childs based on his perceived disabling condition.

230. As a direct and proximate result of Defendant's conduct, Childs suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### **COUNT II: RACE DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq.***

### **(All Defendants)**

231. Childs restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

232. Throughout his employment, Childs was fully competent to perform his essential job duties.

233. Defendants treated Childs differently than other similarly situated employees based on his race.

234. Defendants violated R.C. § 4112.02(A) *et seq.* by discriminating against Childs due to his race.

235. On or about May 29, 2018, Kroger terminated Childs without just cause.

236. At all times material herein, similarly situated non-African-American employees were not terminated without just cause.

237. Defendants terminated Childs based on her/his race.

238. Defendants violated R.C. § 4112.01 *et seq.* when they terminated Childs based on his race.

239. As a direct and proximate result of Defendants' conduct, Childs has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT III: RETALIATORY DISCRIMINATION

### (All Defendants)

240. Childs restates each and every prior paragraph of this complaint, as if it were fully restated herein.

241. As a result of the Defendant's discriminatory conduct described above, Childs complained about the discrimination he was experiencing.

242. Subsequent to Childs's First Report of Discrimination, Childs was placed on a PIP.

243. Subsequent to Childs's Final Report of Discrimination, Childs was terminated.

244. Defendant's actions were retaliatory in nature based on Childs 's opposition to the unlawful discriminatory conduct.

245. Pursuant to R.C. § 4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

246. As a direct and proximate result of Defendant's retaliatory discrimination against and termination of Childs, he suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT IV: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### (Defendant Kroger)

247. Childs restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

248. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, in favor of protecting minors from sexual abuse.

249. For example, R.C. § 2950.034 prohibits people who have been convicted of sex crimes from living near schools, parks, or other places where children are frequently present.

250. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because he/she engages in protected activity under Ohio law.

251. During the relevant period, multiple minors worked at the Sunbury Store.

252. In or about April 2018, Childs reported to Kroger that a Sex Offender was working at the Sunbury Store.

253. In or about April 2018, Childs reasonably believed that minors might be in danger of sexual abuse because a Sex Offender was working at the Sunbury Store.

254. Defendants' termination of Childs jeopardizes the public policy of protecting minors from sexual abuse.

255. Defendants' termination of Childs was motivated by conduct related to the public policy of protecting minors from sexual abuse.

256.  Defendants had no overriding business justification for terminating Childs.

257.  As a direct and proximate result of Defendants' conduct, Childs has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT V: UNLAWFUL AIDING, ABETTING, AND INCITING OF DISCRIMINATION

### (Defendants Gray, Hutchinson, and VanReeth)

258.  Childs restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

259.  Pursuant to R.C. § 4112.02(J), it is unlawful "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice..."

260.  Defendants aided, abetted, incited, coerced, and/or compelled Kroger's discriminatory termination of Childs.

261.  Defendants aided, abetted, incited, coerced, and/or compelled Kroger's discriminatory suspension of Childs' employment.

262.  Defendants aided, abetted, incited, coerced, and/or compelled Kroger's discriminatory treatment of Childs.

263.  Defendants violated R.C. § 4112.02(J) and § 4112.99 by aiding, abetting and inciting discrimination.

264.  As a direct and proximate result of Defendants' conduct, Childs has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT VI: DEFAMATION

### (Defendant Gray)

265.  Childs restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

266. The Termination Excuse was false.

267. After Childs's termination, Gray told Childs's former coworkers and supervisors the Termination Excuse.

268. Gray published false information about Childs.

269. Gray knew that the Termination Excuse was false.

270. Gray should have known that the Termination Excuse was false.

271. Gray acted recklessly as to whether the Termination Excuse was false.

272. The Termination Excuse was defamatory.

273. Childs's reputation was damaged as a result of Gray's publication of the Termination Excuse.

274. Gray's publication of the Termination Excuse has made it more difficult for Childs to find further employment after his termination from Kroger.

275. As a direct and proximate result of Gray's conduct, Childs has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff Tawan Childs respectfully requests that this Honorable Court grant the following relief:

(a) Issue an order requiring Defendants retroactively to restore Plaintiff to one of the positions to which he was entitled by virtue of his application and qualifications, and expunge his personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Childs for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Childs's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ Paul Filippelli

Trisha Breedlove (0095852)
Paul Filippelli (0097085)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Blvd., Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com
Email: paul.filippelli@spitzlawfirm.com

*Attorneys for Plaintiff Tawan Childs*

### JURY DEMAND

Plaintiff Tawan Childs demands a trial by jury by the maximum number of jurors permitted.

/s/ Paul Filippelli

Trisha M. Breedlove (0095852)
Paul Filippelli (0097085)